# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 12, 2014

## STATE OF TENNESSEE v. KEENAN D. SINGLETARY

**Appeal from the Circuit Court for Robertson County**
**No. 74CC2-2012-CR-486    Michael R. Jones, Judge**

---

**No. M2013-01098-CCA-R3-CD - Filed April 22, 2014**

---

Keenan D. Singletary ("the Defendant") pleaded guilty to facilitation of aggravated robbery. Following a sentencing hearing, the trial court sentenced the Defendant to five years' incarceration and ordered the Defendant to pay $174 in restitution. On appeal, the Defendant challenges the length and manner of service of his sentence. After a thorough review of the record and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Circuit Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Roger E. Nell, District Public Defender, Clarksville, Tennessee; and Collier W. Goodlett, Assistant District Public Defender, Springfield, Tennessee, for the appellant, Keenan D. Singletary.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; John W. Carney, Jr., District Attorney General; and Jason White, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

The Defendant was indicted on July 19, 2012, on one count of aggravated robbery. He subsequently pleaded guilty to facilitation of aggravated robbery. At the Defendant's plea submission hearing, the State recited the following factual basis for the plea:

[O]n the date in question one of – we're talking about Commerce Union Bank here in Springfield. The – the teller working the drive-thru window, which would face the Main Street side from a side angle, saw three individuals in black hoodies and what appeared to be face masks walking down on the opposite side of the street. She alerted her fellow coworkers, having some premonition or feeling that they were going to be robbed or entered by – the bank was going to be entered by those individuals.

What I believe it's State's testimony – or I believe the State would attempt to somehow [sic] through witnesses that two of the three men actually came into the – the bank. One of the bank officers, Mr. Scott . . . .

. . . .

. . . Bagwell. Went to the front doors. Commerce Union Bank has an exterior door, a main foyer, interior doors, and – and I believe the testimony would be [Bagwell] told the individuals they weren't going to come into the bank with masks, at – at which point the first pulled a gun, the second quickly thereafter pulled a gun. Those two individuals came into the bank, one hopped the teller line, and essentially those individuals recovered an [sic] excess of $17,000 in cash.

Judge, the – what the – what then next happens is while that was going on one of the bank employees, Betty Lynn, had hit a silent alarm. Officers were on the scene relatively quickly. The – when officers arrived the bank employees were actually outside but the three individuals were gone.

The bank – one of the patrol officers gave chase by going down the – I believe turning on Ninth, and so you [sic] the three – saw three individuals walking near the Centerstone facility on Cheatham. That Centerstone facility is sort of in a direct diagonal, within a short distance as the crow flies, from the bank.

[The Defendant] was apprehended at that time. He was wearing blue jeans, there was – but no hoodie at the time. The – the allegation – the descriptions from witnesses were that they were all – two were wearing black hoddies [sic], one was wearing a dark hoodie, one was in blue jeans, one was in baggie shorts.

Pursuant to the plea agreement, the Defendant's sentence was to be determined by the trial court following a sentencing hearing.

At the sentencing hearing, the presentence report was entered into evidence without objection. Karen Beerman, an employee at Commerce Union Bank, testified that she currently was a bank teller who usually sat at the drive-through window. On May 8, 2012, a customer pulled up to the drive-through window at approximately 11:00 a.m. As Beerman pushed the drawer out to the customer, she noticed three males crossing the street toward the bank wearing jeans and black, hooded sweatshirts with bandanas over their faces. She stated that, as soon as she saw these men, she knew the bank was "about to get robbed." Beerman screamed, and the bank manager, Scott Bagwell, went to the entrance of the bank. When Bagwell reached the interior door at the entrance of the bank, two of the three males (the co-defendants)[1] already were entering the exterior door to the bank. Beerman noticed that each of the co-defendants was carrying a weapon. One of the co-defendants approached Beerman and robbed her, while the other robbed Beerman's coworker, Angela Chowning. Beerman agreed that she gave the co-defendant all the money that she had. She noted that, while the co-defendant was robbing her, he had his gun pointed at her. Likewise, the other co-defendant had his gun pointed at Chowning while robbing her. Beerman estimated that eight or nine individuals were in the bank at the time of this robbery but stated that the co-defendants only directly pointed their guns at three people: Beerman, Bagwell, and Chowning.

When the co-defendants left the bank, Beerman observed one of the three males fleeing the scene by some nearby houses.

Beerman testified that, although she still worked at the bank, she attended monthly counseling because this event "traumatized" her. She agreed that she had become paranoid and very watchful while at work. She had regular nightmares, and this event had impacted all aspects of her life.

On cross-examination, Beerman stated that, when Bagwell reached the front door, he told the co-defendants that they could not enter the bank with their faces covered. At that point, the co-defendants pulled out their guns and pointed them at Bagwell. Out of all the people in the bank, only one customer was present.

Scott Bagwell, the manager and county president of the Commerce Union Bank, testified that on May 8, 2012, approximately twelve employees, including himself, were in

---

[1] Although the Defendant's case was separate from the cases of the other two males, we will refer to these two males as "the co-defendants" to distinguish them from other individuals in the bank.

the customer area at the time of the robbery. Bagwell recalled that one customer was present but that the customer was in an office enclosed by glass. Bagwell was standing at the door of a glass office directly across from the tellers when he heard the tellers begin to yell. Chowning ran toward him yelling "mask, mask," so Bagwell proceeded to the front door of the bank. When Bagwell reached the front door, the co-defendants, clothed in hooded sweatshirts and masks, were entering the outside door. Bagwell told the co-defendants that they could not enter with masks on their face. According to Bagwell, one of the co-defendants pulled out a gun and aimed it at Bagwell's stomach area. Shortly thereafter, the other co-defendant pulled out a "bigger gun" and aimed it at Bagwell's chest and face. Bagwell believed that the "bigger gun" looked like a .357 Magnum.

At this point, one of the co-defendants jumped over the teller window, while the other co-defendant "was just running at everybody" while displaying his gun. One of the co-defendants approached Beerman, and the other approached Chowning. Bagwell did not hear what the co-defendants were saying, but he observed them "stuffing money in their pockets." He recalled that one of the co-defendants pointed a gun at Beerman. As the co-defendants exited the bank, one pointed his gun at Bagwell again. According to Bagwell, numerous individuals in the bank had triggered silent alarms, so the police arrived shortly after the perpetrators fled. Bagwell learned that three individuals were apprehended soon after police arrived at the scene.

Bagwell stated that $17,898 was stolen from the bank. To Bagwell's knowledge, all but $174 of that money had been recovered by law enforcement. Additionally, the bank lost approximately $570 in interest on the stolen money. Because of this robbery, the bank had spent approximately $27,000 in enhanced security.

Bagwell testified that, although this event had not "traumatize[d]" him, the main way in which he had been affected by it was the toll the robbery had taken on his employees. According to Bagwell, employees had suffered from "breakdowns" and occasionally had panicked when individuals similar to the perpetrators entered the bank.

On cross-examination, Bagwell acknowledged that there was no guarantee that the bank would have lent the stolen money if it had been in the bank's possession. He also agreed that the enhanced security measures were not required.

The Defendant testified that he was eighteen years old at the time of the robbery. He had dropped out of high school during his senior year and, while incarcerated, had not attempted to obtain his GED. Although the Defendant had been characterized as the "lookout" in this case, he denied having a cell phone with him on the day of the robbery. Furthermore, he denied wearing a mask or bandana or having a gun with him. According to

-4-

the Defendant, he was with the two co-defendants that day because the three of them were walking down the street to the "center" to play basketball. On the way, the co-defendants informed the Defendant that they needed to stop at the bank to look into opening a checking account. The Defendant waited for them outside until they left the bank running and instructed the Defendant also to run. Eventually, the Defendant and the co-defendants were arrested. He recalled that he was wearing a black t-shirt, blue jeans, and a hat on the day of the robbery.

The Defendant estimated that, as of the day of the sentencing hearing, he had been incarcerated approximately eleven months. He agreed that he had some prior juvenile charges from when he was fifteen or sixteen years old ("the juvenile matter") but stated that those charges had been dismissed. At the time of sentencing, the Defendant had one child. The Defendant had been employed at a nursing home but, at the time of the robbery, was unemployed because he was trying to find a full-time job. He stated that he had a mental disability but "made good grades."

On cross-examination, the Defendant agreed that he had grown up in school with one of the co-defendants. This co-defendant and the Defendant both were charged in the robbery of an individual (the juvenile matter), but the charges were dismissed. He stated that, although he knew nothing about the robbery in this case, he ran from the bank with the co-defendants out of fear.

At the conclusion of the proof at the sentencing hearing, the trial court noted,

> [The Defendant] actually entered a plea of guilty to facilitation of aggravated robbery, . . . and he told this Court that he was guilty of facilitation of aggravated robbery. Under [Tennessee Code Annotated] section 39-11-403 a person is criminally responsible for the facilitation of a felony if knowing that another person – or knowing that another intends to commit a specific felony but without the intent required for criminal responsibility the person knowingly furnishes substantial assistance in the commission of the felony. So by his plea [the Defendant] is admitting that he knew that these two codefendants, or two young men, were going to commit the specific felony of aggravated robbery by robbing Commerce Union Bank.

> So I . . . give a great deal of weight to placing defendants under oath, when they tell me that they commit a crime I make sure they commit a crime before I accept the plea. And that is . . . directly contrary to what [the Defendant] has testified to today.

In the presence report [the Defendant] stated [']first off, I would like to say I take responsibility for my actions. I should have never been with those type of people in the first place. I let them influence me into being involved in something I had no reason to be a part of.['] He was a part and parcel of the aggravated robbery of Commerce Union Bank.

In consideration of mitigating factors, the trial court noted that the Defendant pleaded guilty to the crime but afforded that fact little to no weight, based on the Defendant's apparent lack of remorse. As to enhancement factors, the trial court considered the fact that the offense involved more than one victim but afforded the factor no weight, given that the Defendant's convicted offense was facilitation. The trial court considered with some weight that the Defendant had no hesitation committing a crime when the risk to human life was high. Accordingly, the trial court determined that the Defendant's sentence would be five years.

In determining the Defendant's manner of service of his sentence, the trial court considered that confinement was necessary to avoid depreciating the seriousness of the offense. The trial court reasoned that the principal offense of aggravated robbery carries a mandatory minimum period of incarceration of eight years. Thus, the trial court determined that the Defendant also should serve his sentence for facilitation of aggravated robbery in confinement. The trial court also ordered the Defendant to pay restitution of $174, in addition to court costs.

Accordingly, the trial court sentenced the Defendant to five years to be served in incarceration. The Defendant timely appealed, challenging the length and manner of service of his sentence.

## Analysis

Prior to imposing sentence, a trial court is required to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections ] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2010).

The referenced "principles of sentencing" include the following: "the imposition of a sentence justly deserved in relation to the seriousness of the offense" and "[e]ncouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs." Tenn. Code Ann. § 40-35-102(1), (3)(C) (2010). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(4), (5) (2010).

Our Sentencing Act also mandates as follows:

In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Additionally, a sentence including confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1).

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision." Id. at 709. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

The Defendant first argues that the trial court erred in determining the length of his sentence. Specifically, the Defendant asserts that the trial court erred in its consideration of the factor that "the defendant had no hesitation about committing a crime when the risk to human life was high," Tenn. Code Ann. § 40-35-114(10) (2010), because that factor is essential to the offense of aggravated robbery. See State v. James Arthur Johnson, No. M2009-01147-CCA-R3-CD, 2010 WL 3323796, at *7 (Tenn. Crim. App. Aug. 24, 2010), perm. app. denied (Jan. 13, 2011) ("[T]his particular enhancement factor is generally inapplicable to aggravated robbery convictions because a high risk to human life is inherent in the crime.") (citation omitted). However, this Court has determined that this factor "'might be applicable when the proof established the risk to the life of a person other than the victim.'" Id. (quoting State v. Hicks, 868 S.W.2d 729, 732 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Williams, 977 S.W.2d 101 (Tenn. 1998)). Based on a review of the indictment, the "victim" or "victims" in this case appears to be the bank and its tellers. The testimony adduced at the sentencing hearing established that the co-

defendants pointed their guns not only at the tellers but also at Bagwell, the bank manager. Bagwell also testified that one of the co-defendants "was just running at everybody and just trying to, you know, put fear in everybody, point a gun, including myself, again." Bagwell estimated that twelve employees and one customer were present during the robbery. Accordingly, the trial court did not err in its consideration of this factor.

The Defendant also contends that the trial court should have considered an alternative sentence to incarceration. Our supreme court recently held that the Bise standard of review also is applicable to "questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). Thus, in reviewing a trial court's denial of full probation, the applicable standard of review is abuse of discretion with a presumption of reasonableness so long as the sentence "reflect[s] a decision based upon the purposes and principles of sentencing." Id.

A defendant bears the burden of establishing his or her suitability for probation. See Carter, 254 S.W.3d at 347 (citing Tenn. Code Ann. § 40-35-303(b) (2006)); State v. Mounger, 7 S.W.3d 70, 78 (Tenn. Crim. App. 1999). "This burden includes demonstrating that probation will subserve the ends of justice and the best interest of both the public and the defendant." Carter, 254 S.W.3d at 347 (quoting State v. Housewright, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)). In determining whether to deny probation and impose a sentence involving confinement, the trial court should consider the criteria set forth in Tennessee Code Annotated section 40-35-103(1), supra.

We discern no abuse of discretion by the trial judge in denying an alternative sentence in this case. The record reveals that the trial court considered the purposes and principles of sentencing in making its determination. The record supports the trial court's consideration of the factor examining whether incarceration is necessary to avoid depreciating the seriousness of the offense.

The record indicates that the Defendant participated in an armed robbery of a bank by standing outside the bank while his co-defendants entered the bank and robbed employees at gunpoint. The trial court noted that the Defendant was "part and parcel" of the aggravated robbery but that, for some reason, the State had allowed the Defendant to plead to facilitation of aggravated robbery. The record supports the trial court's findings in this regard. The trial court also correctly noted that a sentence for aggravated robbery is not eligible for probation. See Tenn. Code Ann. § 40-35-303(a) (2010).

Moreover, the trial court, prior to determining the length and manner of service of the Defendant's sentence, noted the inconsistencies in the Defendant's testimony and presentence report. The record supports this finding. The Defendant provided a completely

different story regarding his involvement in the robbery than insinuated in his presentence report. In the presentence report, the Defendant stated,

> First off I would like to say I take responsibilit[y] for my actions. I should have never been with those type of people in the first place. I let them influence me into being involved in something I had no reason being part of. Really and trul[]y I regret ever being there that day if I could take it back I would it had changed me tremendously. . . . Like I said it was a mistake I will never make ag[ai]n[.]

At the sentencing hearing, however, the Defendant denied having any knowledge the co-defendants' intentions to rob the bank. Rather, he claimed that he believed the co-defendants were entering the bank to open checking accounts on the way to play basketball together. Thus, the trial court properly considered the Defendant's lack of candor with the court. See State v. Dowdy, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994) (recognizing that "untruthfulness of a defendant can be the basis for a denial of probation") (citation omitted).

As set forth above, it is a defendant's burden to establish his suitability for probation. See Carter, 254 S.W.3d at 347. We agree with the trial court that the Defendant failed to meet this burden. As also set forth above, unless a defendant establishes that a trial court abused its discretion in imposing sentence, this Court may not overturn the trial court's judgment even if we preferred a different result. See id. at 346. In this case, the Defendant has failed to demonstrate that the trial court abused its discretion in sentencing the Defendant to confinement.

In summary, we hold that the trial court imposed this sentence in a manner consistent with the purposes, principles, and goals of the Sentencing Act. Accordingly, the Defendant is entitled to no relief.

## CONCLUSION

For the reasons set forth above, we affirm the judgment of the trial court.

_____
JEFFREY S. BIVINS, JUDGE